**In re 2001 REDISTRICTING CASES.**

No. S–10504.

Supreme Court of Alaska.

March 21, 2002.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

### Order

In consideration of the consolidated petitions for review of the orders of the superior court, including its Memorandum and Order of February 1, 2002, and after hearing oral

argument on these petitions on March 15, 2002,

IT IS ORDERED:

1. All petitions for review of the superior court's orders regarding the Redistricting Board's Proclamation Plan of June 18, 2001, are GRANTED.

2. This case is REMANDED to the superior court with instructions to further remand it to the board for formulation of a final plan which complies with this order. Article VI, section 11 of the Alaska Constitution directs that this court expedite its redistricting decisions, "affording them priority over all other matters...." This order is made in compliance with this directive in lieu of this court's traditional but more lengthy and time-consuming opinion format.

3. Except insofar as they are inconsistent with this order, the orders of the superior court challenged by the petitioners are AFFIRMED.[1]

4. The stay entered by the superior court February 1, 2002 is VACATED.

■ 5. House District 16 violates the compactness requirement of article VI, section 6 of the Alaska Constitution. House District 16 contains a bizarrely-shaped appendage in the southwestern portion of the district. The inclusion of this appendage is unnecessary to further any other requirement of article VI, section 6, and alternative plans considered by the board contained more compact and otherwise constitutional versions of House District 16.[2]

■ 6. House District 5 is non-compact. The Craig plaintiffs acknowledge that a district including Cordova and extending as far south as Baranof Island would be compact.[3] But they argue that extending the district beyond Baranof Island to the southern boundary of the state violates the compactness requirement. Although we have in the past invalidated Southeast Alaska districts that included Cordova,[4] current population figures justify Cordova's inclusion in House District 5 to prevent substantial deviations in Southeast Alaska. But we agree with the Craig plaintiffs that House District 5 is substantially less compact than required by considerations of population equality and geography. In argument before this court, counsel for the board suggested that House District 5 must remain unchanged to comply with the federal Voting Rights Act. But the board did not make findings justifying the district on this basis. On remand, the board should either correct House District 5 or expressly find that the district's current configuration is required by the Voting Rights Act. Absent such a finding on remand, House District 5 will not be constitutionally compact.

■ 7. House Districts 12 and 32 must be reconsidered on remand because they are based on a mistaken legal premise that constrained the board's view of the permissible range of constitutional options for these ar-

---

1. We commend the superior court for giving prompt and thorough attention to the many issues raised below. Under extreme time pressures, the superior court ably dealt with pretrial and discovery issues, conducted a three-week trial, and issued a thoughtful and well-reasoned opinion of 121 pages.

   We also thank all parties and amici and their attorneys for their helpful briefs, provided under an accelerated briefing schedule, and their flexibility in satisfying procedural requirements for submitting these cases to this court on an expedited basis.

2. In *Hickel v. Southeast Conference*, 846 P.2d 38 (Alaska 1992), we adopted and observed the following priorities relating to redistricting:

   Priority must be given first to the Federal Constitution, second to the federal voting rights act, and third to the requirements of article VI, section 6 of the Alaska Constitution. The requirements of article VI, section 6 shall receive priority *inter se* in the following order: (1) contiguousness and compactness, (2) relative socioeconomic integration, (3) consideration of local government boundaries, (4) use of drainage and other geographic features in describing boundaries.

   *Id.* at 62. We adhere to these priorities in this order.

3. Board Plans 1 and 2 proposed such a district.

4. *Carpenter v. Hammond*, 667 P.2d 1204, 1215 (Alaska 1983) (holding that "inclusion of Cordova in House Election District 2" violated socioeconomic integration requirement, "[a]lthough the question [was] an extremely close one").

eas.[5] The board interpreted this court's decision in *Kenai Peninsula Borough v. State*[6] to preclude the board from pairing population from the Matanuska–Susitna Borough with the Municipality of Anchorage because both Anchorage and the borough had sufficient excess population to "control" an additional seat.[7] But *Kenai Peninsula Borough* does not entitle political subdivisions to control a particular number of seats based upon their populations. *Kenai Peninsula Borough* simply held that the board cannot intentionally discriminate against a borough or any other "politically salient class" of voters by invidiously minimizing that class's right to an equally effective vote.[8] *Kenai Peninsula Borough* recognizes that when a reapportionment plan unnecessarily divides a municipality in a way that dilutes the effective strength of municipal voters, the plan's provisions will raise an inference of intentional discrimination. But an inference of discriminatory intent may be negated by a demonstration that the challenged aspects of a plan resulted from legitimate nondiscriminatory policies such as the article VI, section 6 requirements of compactness, contiguity, and socio-economic integration.

Because the board was mistaken in its interpretation of the doctrine of proportionality, the board's range of choices was unduly limited. We therefore remand so the board can revisit the question of redistricting Southcentral Alaska unencumbered by this mistaken assumption.

■ We do not direct the board to join parts of the Municipality of Anchorage and the Matanuska–Susitna Borough in a single district. We merely hold on the record before us that the doctrine of proportionality does not bar joinder. The board must take a hard look at options that it may have ignored based on its misinterpretation of the law.

■ 8. The trial court correctly concluded that the Delta Junction area has no con-

**5.** *Cf. Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001) ("[R]eview [of the reasonableness of a regulation] consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making.").

**6.** 743 P.2d 1352 (Alaska 1987).

**7.** The Municipality of Anchorage has a population that would support 16.6 house seats. The Matanuska Susitna Borough's population would support 3.8 seats. Taken collectively, these municipalities—which by any measure meet article VI, section 6's relative socio-economic integration requirement—would support 20.4 seats. But under the board's interpretation of the doctrine of proportionality, the Municipality of Anchorage is entitled to control seventeen seats and the Matanuska–Susitna Borough is entitled to control four seats, for a collective total of twenty-one seats.

On remand it is likely that the board will consider whether to combine a portion of the excess population of these two municipalities to create a twentieth district. Doing so would leave a population excess of .4, and would raise the question what to do with that excess. One answer might be to overpopulate slightly each of the twenty districts, adding about 300 people to each district, a positive deviation from the ideal of about two percent. But this choice might be seen as undesirable, especially given the relatively high growth rate of the area, and if this choice is not taken, the question will be whether the .4 excess population can be combined with a neighboring area.

This would raise two issues. The first issue is whether this court's antidilution rule expressed in *Hickel*, 846 P.2d at 52, would permit such a combination. This rule holds that where possible the excess population of a municipality can only go to one other district. For example, in the scenario under discussion here (a joint Anchorage/Matanuska–Susitna district), the excess .4 populations of both municipalities would not fit into a single joint district, thus making it impossible to achieve literal compliance with the anti-dilution rule. We conclude, however, that this need to accommodate excess population would be sufficient justification to depart from the antidilution rule.

The second issue is whether any neighboring area that might be joined with the .4 excess population would be sufficiently integrated. Based on the briefs and oral arguments, it appears to us, under these circumstances, that any neighboring areas north, east, or south of the combined municipalities would meet the constitutional requirement of relative socio-economic integration.

**8.** *See Kenai Peninsula Borough*, 743 P.2d at 1370–73; *see also Karcher v. Daggett*, 462 U.S. 725, 754, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring) (explaining that group of voters must establish that it belongs to "politically salient class" as first element of claim of invidious discrimination); *Gaffney v. Cummings*, 412 U.S. 735, 754, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (recognizing potentially viable equal protection challenges "if racial or political groups have been fenced out of the political process and their voting strength invidiously minimized").

stitutional right to be placed in a single house district. Dividing the area does not violate the constitutional requirement that districts be socio-economically integrated so long as each portion is integrated, as nearly as practicable, with the district in which it is placed. Further, dividing an unorganized area such as the Delta Junction area does not, without more, constitute sufficient evidence of an equal protection violation such that the board must justify its action. Nevertheless, because this order requires reconsideration of the districts encompassing this area, on remand the board should take a hard look at alternatives, including constitutional alternatives that preserve socio-economically integrated areas.

■ 9. Plaintiffs argue that dividing the Lake and Peninsula Borough among House Districts 36 and 37 denies the borough residents equal protection and results in House District 36 not being socio-economically integrated. Because the Kodiak Island Borough does not have enough population to support a house district, the board found it necessary to draw population from either the Lake and Peninsula Borough or the Kenai Peninsula Borough to form House District 36. The board's choice was permissible. The Upper Lakes region is as nearly as practicable socio-economically integrated with the Kodiak Island Borough through such links as their mutual membership in the Southwest Alaska Municipal Conference and their involvement in the commercial fishing industry. These areas have traditionally shared a senate district, and plaintiffs in this case requested that they continue to share a senate district due to the "close interaction and strong integration among all of the communities in Southwest Alaska."

Further, there is no equal protection violation. In *Hickel v. Southeast Conference,* we stated: "The division of a borough which otherwise has enough population to support an election district will be an indication of

gerrymandering." [9] But this statement does not apply to this case because the Lake and Peninsula Borough falls far short of having enough population to support an election district. Moreover, the board offered an uncontroverted, non-discriminatory motivation for its action—it needed the population to complete District 36—and made a reasonable decision to favor dividing the Lake and Peninsula Borough over further fragmenting the Kenai Peninsula Borough.

■ 10. Senate District S does not violate any group's equal protection rights. The board combined House Districts 37 and 38 to form Senate District S, and combined House Districts 35 and 36 to form Senate District R. This configuration split the historic Aleut/Alutiiq senate pairing and divided the Lake and Peninsula Borough into two senate districts. The board did this, in part, as a consequence of the board's decision to join House Districts 5 and 6 in Senate District C. This was necessary to preserve an effective Native senate district to comply with the Voting Rights Act. Although the board should not unnecessarily divide a borough between two senate districts, we conclude that the board offered acceptable reasons for doing so in this case.

■ 11. The board failed to define Anchorage house districts that "contain a population as near as practicable to the quotient obtained by dividing the population of the state by forty." [10] Under the board's plan, the maximum population deviation in Anchorage—i.e., the sum of the absolute values of the two Anchorage districts with the greatest positive and negative deviations—is 9.5%.[11] Before article VI, section 6, was amended in 1998, maximum deviations below ten percent were insufficient, without more, to make out a prima facie case that a plan or part thereof was unconstitutional. Section 6 was amended in 1998 and the present constitutional

---

9. 846 P.2d 38, 51 n. 20 (Alaska 1992).

10. Alaska Const. art. VI, § 6. Under the federal equal protection clause, a state must make an "honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds*

*v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

11. We further note that multiple combinations of Anchorage districts in the board's Proclamation Plan produce deviations ranging from 5.5% to 9.5%.

standard is equality of population "as near as practicable." Newly available technological advances will often make it practicable to achieve deviations substantially below the ten percent federal threshold, particularly in urban areas. Accordingly, article VI, section 6 will in many cases be stricter than the federal threshold. Here the board believed that deviations within ten percent in Anchorage automatically satisfied constitutional requirements; plaintiffs established that the board failed to make any attempt to further minimize the Anchorage deviations.

Because, as the board's counsel conceded at oral argument, the board made no effort to reduce deviations in Anchorage below ten percent, the burden shifted to the board to demonstrate that further minimizing the deviations would have been impracticable in light of competing requirements imposed under either federal or state law. We conclude that the board failed to offer an acceptable justification for the Anchorage deviations.

The board considered and rejected Anchorage plans with significantly lower maximum deviations, apparently because these plans did not respect the board's conception of neighborhood boundaries. But as we held in *Groh v. Egan*,[12] Anchorage neighborhood patterns cannot justify "substantial disparities" in population equality across Anchorage districts.[13] Anchorage is by definition socio-economically integrated, and its population is sufficiently dense and evenly spread to allow multiple combinations of compact, contiguous districts with minimal population deviations.[14] Accordingly, the Anchorage deviations are unconstitutional, and require the board on remand to make a good faith effort to further reduce the deviations.

■ 12. The negative 6.9% deviation in House District 40 results in a 12% statewide maximum population deviation in house districts. The board has failed to justify this deviation. The board moved Pilot Station into House District 6 based upon the board's impression that House District 6 potentially needed a greater Native population to remain an effective Native district under the Voting Rights Act. The board then moved Shishmaref from House District 40 to House District 39 to make up the population shortfall resulting from the Pilot Station transfer. Thus, the House District 40 deviation was indirectly caused by the board's attempt to facilitate favorable review of its plan by the United States Department of Justice under section five of the Voting Rights Act.

But the Voting Rights Act does not require a state to avoid retrogression of minority voting strength if doing so would create a maximum population deviation exceeding ten percent.[15] The negative 6.9% deviation in House District 40 is therefore invalid and must be corrected.

■ 13. The board did not violate the Matanuska Susitna Borough's geographic equal protection rights by failing to award it strictly proportional representation in the legislature. As explained above in paragraph seven, groups of voters are not constitutionally entitled to proportional representation absent invidious discrimination. Failure to keep a borough's house districts together when forming senate districts provides some evidence of discriminatory intent, just as failure to keep all of a borough's excess population in the same house district does.[16] But the board had a valid non-discriminatory jus-

---

12. 526 P.2d 863, 878–79 (Alaska 1974).

13. In *Groh*, we considered testimony concerning patterns of housing, income levels, and minority residency. We observed:

> While such patterns may form a basis for districting, they lack the necessary significance to justify the substantial disparities of 5.9, 6.5 and 8.6 percent. In an urban area such as Anchorage, more mathematical exactness can be achieved than in the sparsely settled portions of the state where pockets of culturally and economically divergent populations may be separated by geographic barriers.

526 P.2d at 879.

14. *See id.* at 878–79.

15. *See* Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 66 Fed. Reg. 5412, 5413 (Jan. 18, 2001). Counsel for the board conceded this at oral argument.

16. *See Hickel*, 846 P.2d at 52 ("[W]here possible, all of a municipality's excess population should go to one other district in order to maximize effective representation of the excess group.").

tification in this case for pairing one of the borough's house districts north with a Fairbanks district: the "fifth" Fairbanks district had to be paired south so that House District 5 could be paired with House District 6 to form an effective Native senate district to avoid retrogression under section five of the Voting Rights Act.

14. The board did not violate the equal protection rights of military personnel by creating House District 18. Neither military personnel nor members of any other group have any constitutional right to be divided among two or more districts to maximize their opportunity to influence multiple districts rather than control one.

15. Assuming that the trial court was correct in finding that some of the board members' e-mail exchanges violated the Open Meetings Act,[17] we agree with the trial court that no remedy is appropriate. We hold that the superior court properly concluded that, based on the factors set out in AS 44.62.310(f), "the public interest[ ] in requiring compliance with the Open Meetings Act does not outweigh the harm that would be caused to the public interest by voiding the entire Redistricting Plan on this basis." Because we hold that the superior court permissibly refused to grant any remedy for the particular e-mail exchanges it found to violate the Open Meetings Act, we need not address whether these e-mail exchanges actually violated the Act. We further conclude that the superior court did not err by failing to find additional violations of the Act.

16. We hold that plaintiffs' due process challenges to the board's development of the Proclamation Plan have no merit.

17. Redistricting in Alaska is a task of "Herculean proportions." [18] The challenge of creating a statewide plan that balances multi-

ple and conflicting constitutional requirements is made even more difficult by the very short time-frame mandated by article VI, section 10 of the Alaska Constitution. But these great difficulties do not absolve this court of its duty to independently measure each district against constitutional standards.[19]

The board, at great personal and professional sacrifice to individual members and staff, made extraordinary efforts in discharging its duties. This court's invalidation of some aspects of the board's plan should not be read as a general criticism of the board's work. On the contrary, the board is to be commended for its diligent, conscientious efforts to achieve the basic goal of redistricting—"adequate and true representation by the people in their elected legislature; true, just, and fair representation." [20]

Entered at the direction of the court.

BRYNER, Justice, dissenting in part.

I dissent from one aspect of the court's order: its conclusion that House District 5 cannot pass constitutional muster without further justification.

Although the issue is admittedly close, I believe that the proclaimed version of House District 5 and the earlier version proposed in Board Plans 1 and 2 are both constitutionally permissible alternatives. On the one hand, as today's order correctly observes, the version proposed in Board Plans 1 and 2 is undeniably more compact than the Proclamation Plan's version; but on the other hand, the Proclamation Plan's version could reasonably be seen as offering relatively superior socio-economic integration throughout Southeast Alaska. In my view, article VI, section 6, of the Alaska Constitution gives compactness and socio-economic integration equiva-

---

**17.** The Open Meetings Act is set out in AS 44.62.310 and AS 44.62.312.

**18.** *Egan v. Hammond,* 502 P.2d 856, 865–66 (Alaska 1972), *quoted in Hickel,* 846 P.2d at 50; *Kenai Peninsula Borough,* 743 P.2d at 1359; *Groh,* 526 P.2d at 875 (recognizing difficulty of creating equipopulous districts which conform to all article VI, section 6 requirements).

**19.** Alaska Const. art. VI, § 11 (conferring appellate jurisdiction on supreme court to review re-

districting challenges "on the law and the facts"); *Groh,* 526 P.2d at 867 (holding that this court reviews redistricting plans de novo upon record developed in superior court), *cited in Kenai Peninsula Borough,* 743 P.2d at 1358.

**20.** 3 Proceedings of the Alaska Constitutional Convention (PACC) 1835 (Jan. 11, 1956), *quoted in Hickel,* 846 P.2d at 44.

lent stature as redistricting criteria; it thus seems to me that neither version of House District 5 can claim *constitutional* superiority. Because the board has broad discretion to select the most desirable among constitutionally permissible alternatives, I would uphold House District 5 as proclaimed.

In all other respects, I join in the court's order.

CARPENETI, Justice, dissenting.

The court today strikes down—directly or indirectly—over two-thirds of the election districts fashioned by the board.[1] I disagree with several individual aspects of today's Order, and discuss those points in this dissent. Fundamentally, though, I disagree with the Order because it fails to truly consider the statewide responsibilities of the board and the need for the board, at the end of the day, to prepare a plan that works across the entire state.

## Proclamation House District 5

The Order invalidates Proclamation[2] House District 5 on the ground that it is non-compact. But Alaska's constitution "calls only for relative compactness;"[3] this is because the state's geography and population distribution make it impossible to draw conventionally compact districts that neatly ap-

proximate regular shapes like squares and circles. We have frequently allowed some departure from strict compactness in a given district in order to accommodate all of the constitutional criteria for all of the districts in the state.[4] We have previously noted the difficulty of drawing districts in Alaska and emphasized the need for flexibility so that all constitutional requirements may be satisfied as nearly as practicable: " 'When Alaska's geographical, climatical, ethnic, cultural, and socio-economic differences are contemplated the task assumes Herculean proportions commensurate with Alaska's enormous land area. The problems are multiplied by Alaska's sparse and widely scattered population and the relative inaccessibility of portions of the state.' "[5]

In the "Board Plans"[6] advocated by the Craig plaintiffs and impliedly accepted as "compact" by today's Order, the proposed "Islands District" encompassing Prince of Wales Island begins at the Canadian border on the south, includes a 300–mile section of the mainland, almost all of Prince of Wales Island, all of Kupreanof and Kuiu Islands, almost all of Admiralty Island, about half of Chichagof Island, and then returns to the mainland to include a long, thin section of the mainland which ends in a long, thin appendage slicing the Haines Borough in two and incorporating Klukwan but bypassing Haines

1. The Order explicitly strikes down House Districts 5, 12, 16, 32, and the Anchorage Districts 17–31. Furthermore, the Order instructs the board to make changes to House Districts 6, 39, and 40, thereby directly striking down a total of twenty-two of forty House districts. These districts necessarily implicate twelve of twenty Senate Districts: District C (House Districts 5 and 6), District F (House District 12), District H (House District 16), District T (House Districts 39 and 40), and the Anchorage Districts I–P (House Districts 17–32).

This Order will indirectly necessitate changes to other districts, as well. With a conservative estimate of at least one other contiguous district being affected for each district explicitly struck down (not including the Anchorage districts, with the exception of District 32), four additional House districts are affected (District 1, District 35, District 36, and District 38). These four additional House districts affect another three Senate districts (District A, District R, and District S). In total, today's Order directly or indirectly affects forty-one of sixty districts. If the Order necessitates changes in all of the districts contiguous with those explicitly struck down, for-

ty-seven of sixty districts are directly or indirectly affected.

2. Districts finally adopted by the Redistricting Board are called "Proclamation" districts.

3. *Carpenter v. Hammond*, 667 P.2d 1204, 1218 (Alaska 1983) (Matthews, J., concurring) (adopted by the full court in *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1361 & n. 13 (Alaska 1987)).

4. *See, e.g., Hickel v. Southeast Conference*, 846 P.2d 38, 52 & n. 23 (Alaska 1993).

5. *Id.* at 50 (quoting *Egan v. Hammond*, 502 P.2d 856, 865–66 (Alaska 1972)), *quoted in Groh v. Egan*, 526 P.2d 863, 875 (Alaska 1974) and *Kenai Peninsula Borough*, 743 P.2d at 1359.

6. "Board Plans" 1 and 2, which were among the four plans originally promulgated by the board, were not ultimately adopted by the board. As noted above in note 2, districts finally adopted by the board are known as "Proclamation" districts.

on its way to Klukwan. Proclamation House District 5, extending west to include Cordova, is not "substantially less compact" than the "Islands District" in the plan advocated by the Craig plaintiffs. As the options before the board were all relatively compact, the board had the discretion to choose among the differing plans. As Judge Rindner found, the board's decision to keep smaller, rural communities together was a reasonable choice: Proclamation District 5 did not have the appendage problem of Board Plans 1 and 2 and public testimony from small communities urged the board to create a district that did not include them with larger, urban communities. Indeed, the board's plan enjoyed the distinction of being endorsed by every legislator—Republican and Democrat, urban and rural, Native and Caucasian—in all of Southeast Alaska.

Correctly viewing redistricting as a process that requires the board to constantly look beyond the borders of the district being fashioned, the board made a reasonable choice in drawing Proclamation House District 5. The district is substantially more compact than a number of districts in the state,[7] is easily as compact as Board Plans 1 and 2 because it avoids the Klukwan appendage problem that infects those alternative plans,[8] and is sufficiently socio-economically integrated. The superior court's affirmance of the board's action in creating Proclamation District 5 should be upheld.

## Proclamation House Districts 12 and 32

Judge Rindner carefully analyzed the problems presented by the formation of Proclamation House Districts 12 and 32. He found that Proclamation District 12 could not survive close scrutiny because of insufficient socio-economic integration between the northern and southern halves of the district, separated as they were by the Alaska Range and long-established habits of economic and social activity. The evidence showed that the northern communities interacted with each other and the southern communities interacted with each other, with almost no interaction between the northern and southern halves of the district. Judge Rindner's similarly careful consideration of the evidence concerning Proclamation House District 32 led him to the opposite conclusion with regard to that district. He found that "[b]ased on all of the evidence, ... District 32 contains as nearly as practicable a relatively integrated socio-economic area." Applying the correct legal standard on review, he said, "It is clear that the Board gave careful consideration and extensive deliberation to this district and took a hard look at the factors both in favor and against such a pairing." He therefore struck down Proclamation District 12 and upheld Proclamation District 32. Because Judge Rindner correctly understood and applied the relevant law, I dissent from this court's holding that Proclamation House District 32 must be remanded for further consideration.

Under *Kenai Peninsula Borough v. State*,[9] strict proportionality is not a constitutional requirement.[10] However, "the interest of individual members of a geographic group or

---

7. For example, Proclamation House District 40 covers the entire North Slope of the state; Proclamation House District 37 comprises the entire Aleutian Chain as well as part of the mainland; and Proclamation House District 6, the largest single district, extends from the Canadian border just north of Yakutat (a point about 350 miles east of Anchorage), reaches as far north as the Brooks Range and Arctic Village, encompasses almost all of the Yukon River drainage and most of the Kuskokwim River drainage, and extends as far west as Marshall and Russian Mission (to a point about 400 miles west of Anchorage). This district appears to be slightly larger than the State of Texas, which may be fitting given its horseshoe shape.

8. Indeed, a comparison of Proclamation House District 16—which the Order properly strikes because of an appendage that rendered it non-compact—and the "Islands District" in Board Plans 1 and 2—which the Order finds to be compact despite a substantially more prominent appendage—illustrates the correctness of the board's rejection of Board Plans 1 and 2 as an alternative to Proclamation District 5.

9. 743 P.2d 1352 (Alaska 1987).

10. *Id.* at 1370 n. 33 (stating that "We note that article VI, section 6 alone identifies the criteria governing reapportionment; if the framers had intended to make proportionality a criterion for the establishment of new districts, they presumably would have included it in this section or written a sister provision.").

community in having their votes protected from disproportionate dilution by the votes of another geographic group or community" is a significant constitutional interest.[11] By definition, a borough is socio-economically integrated.[12] That integration, the contiguous, and often compact, nature of boroughs, and the significant constitutional interest in protecting the equally effective votes of residents of an organized geographic area requires the board to attempt to draw districts that allow communities to control the whole number of seats to which they are entitled. We have previously stated that "where possible, all of a municipality's excess population should go to one other district in order to maximize effective representation of the excess group."[13] This principle is even more compelling when the "excess" population could constitute the majority of a new district.

The board, therefore, was properly concerned about placing excess populations from Anchorage and the Mat–Su Borough—each of which was sufficient to constitute the majority of a district—into a single district. This legitimate concern resulted in the board's ultimate decision to create a plan that allowed Anchorage, with a population supporting 16.6 House seats, to have the excess population placed in a seventeenth district, and Mat–Su, with a population supporting 3.8 House seats, to have its excess population placed in a different district. Splitting either of these boroughs' excess population, members of a "politically salient class," would clearly have resulted in diluting the voting power of the "excess" voters of each borough. Such dilution would have constituted evidence that the individual voters' rights to geographic equal protection had

been violated by the board, and predictably would have led to litigation.[14]

While the board's decision to attempt to draw districts that gave boroughs control over the whole number of seats to which they were entitled was reasonable, this consideration cannot be elevated over the constitutional mandates of one-person, one-vote, contiguity, compactness, and socio-economic integration. As Judge Rindner found, Proclamation House District 12 is not sufficiently socio-economically integrated. The board's decision to value proportionality does not justify the creation of a district that is not socio-economically integrated. Accordingly, I agree that this district is unconstitutional.

Proclamation House District 32, on the other hand, is sufficiently socioeconomically integrated. Judge Rindner found, and I agree, that "District 32 contains as nearly as practicable a relatively integrated socio-economic area. This integration is not minimal but significant." As Proclamation House District 32 is sufficiently socioeconomically integrated, the board's decision to create this district and thereby protect the effectiveness of the vote of the "excess population" involved, was rational. The board should not be required to reconsider Proclamation House District 32.

### Anchorage House Districts

We have long held that population deviations under 10% are "minor deviations" that do not require further justification; they are presumptively constitutional.[15] The superior court found that the board's attempt to preserve neighborhood boundaries in Anchorage was not improperly motivated, a conclusion that this court accepts. Yet today's Order

11. *Id.* at 1371.

12. *Hickel v. Southeast Conference,* 846 P.2d 38, 52 (Alaska 1993).

13. *Id.*

14. *Id.* at 52 n. 26 ("Dividing the municipality's excess population among a number of districts would tend to dilute the effectiveness of the votes of those in the excess population group. Their collective votes in a single district would speak with a stronger voice than if distributed among several districts.").

15. *Id.* at 48; *see also Groh v. Egan,* 526 P.2d 863, 877 (Alaska 1974) ("[I]n the absence of a showing that the manner of reapportioning a state was improperly motivated or had an impermissible effect, deviations of up to ten percent require no showing of justification."). Indeed, the United States Supreme Court has upheld deviations over 16%, where such deviations were justified by legitimate considerations. *Mahan v. Howell,* 410 U.S. 315, 328–30, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

invalidates sixteen house districts in Anchorage on the ground that the board did not make a sufficient effort to further reduce deviations that we have consistently said are minor and need no further justification.[16] The order attempts to justify this surprising result on two grounds. Neither survives scrutiny.

First, the Order suggests that the constitutional change adopted by the voters in 1999 justifies dramatically stricter standards in redistricting. But a simple comparison of the language of the former provision and the current provision shows that the change made the standard more *flexible*, not more strict. Article VI, section 6 previously provided: "Each area shall contain a population at least equal to the quotient obtained by dividing the total civilian population by forty." That provision literally required that each district contain the same number of civilians as every other district: Each had to be "at least equal" to every other; once any district contained an excess of population, another district would fail to have "at least"

that many persons. Whatever might be said about the feasibility of meeting this standard, it is clear that the standard was very high. In 1998 [17] the citizens of Alaska voted to adopt new language for article VI, section 6. The new language provides, "Each [house district] shall contain a population as near as practicable to the quotient obtained by dividing the population of the state by forty." Clearly, the new language—"as near as practicable"—created a more flexible standard than the language it replaced—"equal".[18]

Second, today's Order relies on *Groh v. Egan*[19] for the proposition that "Anchorage neighborhood patterns cannot justify deviations so close to the ten percent threshold." But in *Groh v. Egan* we were faced with a plan with a total deviation of *29%*.[20] We addressed three Anchorage districts, which respectively were underrepresented by 5.9%, 6.5%, and 8.6%,[21] in the context of a total deviation of 29%. In holding that neighborhood patterns cannot justify "substantial disparities," we were unmistakably referring to total deviations over 10%. By comparison,

**16.** The Order is particularly puzzling in that it squarely places the burden on the board to justify *de minimis* deviations, Order at 9, effectively but silently reversing longstanding precedent from this court. *Groh*, 526 P.2d at 877 (stating that in the absence of a showing of improper motive or impermissible effect, "deviations of up to ten percent require *no showing of justification*") (emphasis added). We relied on federal law in announcing this rule, citing both the Court's opinion in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and Justice Brennan's dissent in that case to the effect that "a line has been drawn at 10%—deviations in excess of that amount are apparently acceptable only on a showing of justification by the State; deviations less than that amount require *no justification whatsoever*." *Id.* at 776, 93 S.Ct. 2332 (Brennan, J., dissenting) (emphasis added).

**17.** The new constitutional provision took effect January 3, 1999. Committee Substitute for Senate Bill (C.S.S.B.) 44, 20th Leg. 1st Sess. (1999).

**18.** The legislative history of the provision tends to confirm this view. A section-by-section analysis of the proposed constitutional amendment, prepared for the House Judiciary Committee, commenting on section 4 (which was to become article VI, section 6) stated, with regard to the "as nearly as practicable" language, "Since Alaska Supreme Court and U.S. Supreme Court decisions make clear that minor deviations from an ideal one-fortieth reapportionment per district

are permissible, the 'as nearly as practicable' language is added." Sectional Analysis for HJR 44 0–LS0528/C, Original Bill File, House Judiciary Comm. (Feb. 4, 1998).

Virtually identical language is found in the Sectional Analysis prepared for the Senate Judiciary Committee on the same provision. With regard to the "as nearly as practicable" language, the analysis reads: "Since U.S. Supreme Court and Alaska Supreme Court cases make clear that minor deviations from an ideal one-fortieth of the state's population are permissible for house and senate districts, the 'as nearly as practicable' language is added." Sectional Analysis for CS FOR HJR 44(RLS), Original Bill File, Senate Judiciary Comm. (April 6, 1978).

**19.** 526 P.2d 863 (Alaska 1974).

**20.** *Id.* at 874, 878–79.

**21.** The *Groh* opinion does not divulge the Anchorage district with the greatest *over*representation. Accordingly, we do not know the "maximum population deviation in Anchorage" in the redistricting plan that *Groh* addressed. It is therefore not possible to construct the figure that would be comparable to the 9.5% "maximum population deviation in Anchorage" that today's Order describes. But it is likely that the comparable figure would have been substantially higher in the *Groh* case, for no Anchorage district in the present plan exceeds 4.8% deviation.

the greatest Anchorage deviation struck down today is 4.8%, and the maximum state-wide deviation—a deviation figure that Anchorage has nothing to do with [22]—is 12%. *Groh v. Egan* simply does not support the court's invalidation of sixteen Anchorage house districts.

Here, the board's stated purpose of trying to maintain neighborhood boundaries within Anchorage, once it had fully complied with the one person, one vote requirement, resulted in the board's decision not to attempt to further minimize deviations within Anchorage below what we have previously determined to be *de minimis*.[23] It did so in order to preserve neighborhoods,[24] a proper motive.[25] It had no impermissible effect. In sum, I believe that the board's approach was entirely proper and conformed to all constitutional requirements. This court should uphold Judge Rindner's affirmance of the board.

### Proclamation House District 40

Today's Order invalidates Proclamation House District 40 on the ground that the board incorrectly believed that the 6.9% population deviation in that district was required by the Voting Rights Act. Because I do not believe that is an accurate description of the reason that the board fashioned District 40 as it did, I dissent.

22. In this redistricting plan, the most overrepresented district is House District 40 (the North Slope) with a −6.89% deviation. The most underrepresented district is House District 33 (Kenai Peninsula), with a +5.06% deviation. Accordingly, the plan's statewide "total deviation" is 11.95%, rounded to 12%.

23. *Groh*, 526 P.2d at 877 ("We conclude that in the absence of a showing that the manner of reapportioning a state was improperly motivated or had an impermissible effect, deviations of up to ten percent require no showing of justification.").

24. The Order does not appear to challenge the conclusion that the board's purpose was to preserve neighborhoods, a conclusion that was supported by the evidence. For example, the board heard substantial expert testimony about the socio-economic characteristics of Anchorage neighborhoods, and a majority of the Anchorage Assembly endorsed, as the plan that best kept

To understand what occurred in regard to District 40, some background information is necessary. Proclamation House District 40 encompasses a very large area—approximately 133,000 square miles—that is sparsely inhabited. The board had only two options to obtain sufficient population: adjoining District 6 or adjoining District 39.

The board considered but rejected the option of taking population from District 6, because District 6 is a majority Athabaskan district, whereas District 40 is a majority Inupiaq district. In *Hickel v. Southeast Conference*,[26] we recognized that combining these disparate populations may be "the single worst combination that could be selected if a board were trying to maximize socioeconomic integration in Alaska."[27] Clearly, the board's decision not to take population from District 6 was reasonable and fully justifiable.

The board's other option was to take population from District 39. The closest community in that district is Shishmaref. But if the board were to have done that, the deviation in District 39 would have been −7.8%, greater than District 40's −6.9%.

The board could have lowered the 7.8% deviation by moving Pilot Station from District 6 to District 39 (its former district), but such a move would have increased the deviation in District 6 to −8.2%, again, a greater deviation.[28] Accordingly, the board conclud-

neighborhoods intact, a package of districts that became most of the final Proclamation districts.

25. *Groh*, 526 P.2d at 879 ("[Patterns of housing, income levels, and minority residency] may form a basis for districting.").

26. 846 P.2d 38 (Alaska 1993).

27. *Id.* at 53 (internal quotation marks omitted).

28. Attempts to lower the deviation in District 6 to acceptable levels were not feasible: District 6 is contiguous with the other effective Native districts, Districts 5 and 37 40. However, these districts are already underpopulated. While District 6 is also contiguous with the districts that include the urban areas of Kenai, Anchorage, Mat Su, and Fairbanks, these areas have minimal, if any, socio-economic integration with the Interior Rivers area, District 6. Given the higher population deviations that would have resulted from trying to reduce District 40's underpopu-

ed that District 40's population shortfall was justified by the difficulty of obtaining offsetting population blocks without violating the board's policies of achieving socio-economic integration and preserving political and Native corporation boundaries. Thus, while the board's initial concerns involved the Voting Rights Act, Judge Rindner found that "[a]ll Board members joined in the decision to approve the boundaries of House District 40, *believing that this choice would result in the lowest population deviation.*" (Emphasis added.)

Judge Rindner found that the board's −6.9% deviation in Proclamation House District 40 was justified. As he concluded, "[b]oth the size and the unavailability of easily moved population blocks make this deviation acceptable [and] justified." Judge Rindner noted that the board moved Pilot Station out of District 39 into District 6 to increase the Native population in District 6. As a consequence, the resulting deviation of Proclamation House District 40 was the lowest possible deviation. Although Judge Rindner found that moving Pilot Station from District 6 to District 39 would have had Voting Rights Act implications—which in themselves would not have been enough to justify a total deviation in excess of 10%[29]—the reason for the move was *not* to satisfy the Voting Rights Act but to achieve the lowest population deviation consistent with other constitutional requirements, including socio-economic integration.

For these reasons, I believe today's Order misapprehends the impact of the Voting Rights Act on the board's actions. Even ignoring the federal act entirely, the board had few options and exercised one that is fully consistent with constitutional requirements. Finally, as a point of reference, the 12% total statewide deviation that the board's plan contained is the *lowest* deviation in any redistricting plan in Alaska's history.

I would uphold Judge Rindner's affirmance of the board's Proclamation House District 40.

## Conclusion

I fully agree with the Order's observations that redistricting presents formidable challenges to a citizen board that operates under extraordinary time pressures, and that this board should be "commended for its diligent, conscientious efforts to achieve the basic goal of redistricting." It is because the task is so difficult, the time so short, and the job on remand so remarkably heavy that this court should not strike down or otherwise throw into question two-thirds of the districts unless they are truly unconstitutional. Because I believe that only Proclamation Districts 12 and 16 fail to meet constitutional requirements, I dissent from those parts of today's Order that do not affirm the trial court. I would affirm the decision of Judge Rindner in all respects.

lation, the board's decision to keep Pilot Station in District 6, though originally for Voting Rights Act reasons that do not justify a deviation in excess of 10%, was reasonable. Additionally, it had the benefit of maintaining District 6, the only district in Alaska shown to have racially polarized bloc voting, as an effective Native district.

**29.** Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 42 U.S.C.1973c; Notice, 66 Fed.Reg. 5412, 5413 (Jan. 18, 2001) ("For state legislative and local redistricting, a plan that would require overall deviations greater than 10 percent is not considered a reasonable alternative.")