# In the Supreme Court of the State of Alaska

In Re 2011 Redistricting Cases ⟩
⟩     Supreme Court No. **S-14721**
⟩     **Order**
⟩     **Petition for Rehearing**
⟩
⟩     Date of Order: **2/15/13**

Trial Court Case # **4FA-11-02209CI**

Before:     Fabe, Chief Justice, Winfree and Stowers, Justices, and Matthews and Carpeneti, Senior Justices* [Maassen and Bolger, Justices, not participating]

On consideration of the Petition for Rehearing filed by the Alaska Redistricting Board on **1/7/13**,

**IT IS ORDERED:**     The petition for rehearing is **GRANTED** to the following extent:

On page 12 of the Opinion, "36 unchanged house districts" is modified to read "22 unchanged house districts," and on page 13 "these 36 districts" is changed to "these 22 districts."

In all other respects, the petition for rehearing is **DENIED**.

Entered by the direction of the court.

Clerk of the Appellate Courts

Marilyn May

Fabe, Chief Justice, and Matthews, Senior Justice, dissent. They would grant the petition for the reasons expressed in their dissent.

---

\* Sitting by assignment under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

IN RE 2011 REDISTRICTING
CASES

)
)
)
)
)
)
)
)
)
)
)

Supreme Court No. S-14721

Superior Court No. 4FA-11-02209 CI

O P I N I O N

No. 6741 - December 28, 2012

Petition for Review from the Superior Court of the State of Alaska, First and Fourth Judicial Districts, Juneau and Fairbanks, Michael P. McConahy, Judge.

Appearances: Michael D. White and Nicole A. Corr, Patton Boggs LLP, Anchorage, for Petitioner Alaska Redistricting Board. Michael J. Walleri and Jason Gazewood, Gazewood & Weiner PC, Fairbanks, for Petitioners Ronald Dearborn and George Riley. Thomas F. Klinkner, Birch Horton Bittner & Cherot, Anchorage, for Respondents Brenda Norheim, Mark Jensen, and Nancy Strand. Scott A. Brandt-Erichsen, Assistant Borough Attorney, Ketchikan, for Respondent Ketchikan Gateway Borough. Joseph H. McKinnon, Anchorage, for Amicus Alaska Democratic Party. Natalie A. Landreth, Native American Rights Fund, Anchorage, for Amici Alaska Federation of Natives; Bristol Bay Native Corporation; First Alaskans Institute; McGrath, Takotna, Nicolai, et al.; and Bering Straits Native Corporation. Joseph N. Levesque, Levesque Law Group, LLC, Anchorage, for Amicus Aleutians East Borough. Carol Brown, Association of Village Council Presidents, Bethel, for Amicus Association of Village Council Presidents. Jill S. Dolan, Assistant Borough Attorney, and A. René Broker, Borough

Attorney, Fairbanks, for Amicus Fairbanks North Star Borough. Marcia R. Davis, Calista Corporation, Anchorage, for Amicus Calista Corporation. Thomas E. Schulz, Ketchikan, for Amicus RIGHTS Coalition. Brooks W. Chandler, Boyd Chandler & Falconer, Anchorage, for Amicus Haines Borough. Jonathan Tillinghast, James Sheehan, and E. Budd Simpson III, Simpson, Tillinghast, Sorenson & Lorensen, Juneau, for Amici Sealaska Corporation and Central Council of Tlingit & Haida Indian Tribes of Alaska. Christopher Lundberg, Haglund Kelly Horngren Jones & Wilder LLP, Portland, Oregon, for Amicus Metlakatla Indian Community.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices, and Matthews, Senior Justice.[*]

CARPENETI, Chief Justice.
WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting in part.
MATTHEWS, Senior Justice, with whom FABE, Justice, joins, dissenting.

## I. INTRODUCTION

Earlier in the current redistricting cycle, we issued an order remanding to the superior court with instructions to remand to the redistricting board to formulate a new plan in compliance with our case law. We agreed with the superior court that, in drafting its plan, the board failed to follow the process we mandated in order to ensure that the redistricting plan would comply with the Alaska Constitution and thus may have unnecessarily violated the Alaska Constitution. Upon remand, the board was instructed to follow this process so that we could appropriately judge whether its violations of the

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

Alaska Constitution were absolutely necessary for compliance with federal law.  The board then submitted a modified plan to the superior court that changed only four out of forty house districts from the original plan; this amended plan was similarly rejected by the superior court because, among other reasons, the board failed to follow the process that we required in order to ensure compliance with the Alaska Constitution.  The board petitions for review of the superior court's decision.  We accept  the petition for review and, because the board failed to follow the process that we ordered upon remand, we affirm the decision of the superior court and require the board to draft a new plan for the 2014 elections.  We agree with the board that it is not required to make specific findings about each individual district relating to the requirements of the Alaska Constitution nor to submit a plan to the superior court at each stage of drafting.

## II.    FACTS AND PROCEEDINGS

Article VI, section 3 of the Alaska Constitution requires reapportionment of the Alaska Legislature every ten years.  Under article VI, section 10 of the Alaska Constitution, the Alaska Redistricting Board (the Board) must adopt one or more proposed redistricting plans within 30 days after receiving official census data from the federal government.  The Board must then hold public hearings on the proposed plans and adopt a final plan within 90 days of the census reporting.  Because Alaska is covered by section 5 of the federal Voting Rights Act (VRA),[1] the Board must also submit its final plan to the U.S. Department of Justice (DOJ) for preclearance to ensure that any

---

[1]    Fannie Lou Hamer, Rosa Parks, & Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, §5, 120 Stat. 580 (2006) (codified at 42 U.S.C. § 1973c (2006)).

voting changes do not diminish minorities' ability to "elect their preferred candidates of choice."[2]

Following the 2010 census, the Board received the official census data on March 13, 2011. On April 8, 2011, the Board hired Dr. Lisa Handley, a VRA expert. Dr. Handley strongly recommended that the Board begin its redistricting process by focusing on creating effective Native districts,[3] given the difficulties posed by VRA compliance in Alaska. On June 13, 2011, the Board formally adopted its final Proclamation Plan. This plan received preclearance from the DOJ on October 11, 2011.

Three separate lawsuits were initially filed in superior court challenging the Board's final plan by four plaintiffs: the Fairbanks North Star Borough (FNSB), the City of Petersburg, and George Riley and Ronald Dearborn, residents of Ester and the Goldstream Valley (collectively Riley). These cases were later consolidated. The FNSB then moved to dismiss its action, which the court granted with the proviso that the Riley plaintiffs could pursue the FNSB claims. The City of Petersburg also dropped out of the suit after the superior court granted summary judgment to the Board on the issue that Petersburg had raised; Petersburg did not ask for reconsideration from the superior court or file a petition for our review. Before trial, the superior court denied Riley's claim challenging the process used by the Board to formulate its proclamation plan, and on February 3, 2012, the superior court issued its opinion denying Riley's claims alleging unconstitutional vote dilution. In its opinion, however, the superior court also concluded

---

[2]     42 U.S.C. § 1973c(d) (2006).

[3]     The superior court defined "effective Native districts" as "districts where Natives have an ability to elect a candidate of their choice." *See also Corbett v. Sullivan*, 202 F. Supp. 972, 984 (E.D. Mo. 2002) (defining "effective minority district" as one where minority had "opportunity to elect candidates of their choice").

that Proclamation House Districts 1, 2, 37, and 38 unnecessarily deviated from the requirements of the Alaska Constitution.

Both the Board and Riley filed petitions for review. Several entities also filed amicus briefs, including the FNSB, the Aleutians East Borough, Calista Corporation, and a coalition of several Alaska Native groups. On March 14, 2012, we issued an order holding that the Board's Proclamation Plan did not comply with the process mandated in *Hickel v. Southeast Conference*[4] (the *Hickel* process), and we remanded the case accordingly.[5]

In our order, we gave the Board explicit instructions and specified a process that

> the Board must follow to ensure that our constitutional redistricting principles are adhered to as closely as possible. After receiving the decennial census data, the Board must first design a reapportionment plan based on the requirements of the Alaska Constitution. That plan then must be tested against the Voting Rights Act. A reapportionment plan may minimize article VI, section 6 requirements when minimization is the only means available to satisfy Voting Rights Act requirements.[6]

After setting forth the correct process for the Board to follow in order to comply with the Alaska Constitution, we concluded that it was "undisputed that the Board began redistricting in March and April of 2011 by focusing on complying with the Voting

---

[4]   846 P.2d 38, 51 n.22 (Alaska 1992).

[5]   *See In re 2011 Redistricting Cases*, 274 P.3d 466 (Alaska 2012).

[6]   *Id*. at 467 (quoting *Hickel*, 846 P.2d at 51 n.22 (internal quotation marks and formatting omitted)).

Rights Act, thereby ignoring the process we mandated."[7]  Thus, we found the Board erred by reversing steps one and two of the *Hickel* process.

Additionally, we explained why failure to follow the *Hickel* process was fatal to the Board's plan:  The failure prevented meaningful judicial review because we could not discern whether the Board's deviations from Alaska constitutional requirements were actually necessary.  We stated:

> Because it did not follow the *Hickel* process, the Board cannot meaningfully demonstrate that the Proclamation Plan's Alaska constitutional deficiencies were necessitated by Voting Rights Act compliance, nor can we reliably decide that question. The *Hickel* process provides the Board with defined procedural steps that, when followed, ensure redistricting satisfies federal law without doing unnecessary violence to the Alaska Constitution. The Board must first design a plan focusing on compliance with the article VI, section 6 requirements of contiguity, compactness, and relative socioeconomic integration; it may consider local government boundaries and should use drainage and other geographic features in describing boundaries wherever possible. Once such a plan is drawn, the Board must determine whether it complies with the Voting Rights Act and, to the extent it is noncompliant, make revisions that deviate from the Alaska Constitution when deviation is "the only means available to satisfy Voting Rights Act requirements."[8]

The Board was left with clear instructions to fulfill its constitutional mandate and we further elaborated on the importance of the *Hickel* process in redistricting:

---

[7]  *Id*.

[8]  *Id.* at 467-68 (quoting *Hickel*, 846 P.2d at 51 n.22).

The *Hickel* process assures compliance with the Alaska Constitution's requirements concerning redistricting to the greatest extent possible.  The *Hickel* process also diminishes the potential for partisan gerrymandering and promotes trust in government. . . .  A redistricting plan that substantially deviates from these constitutional requirements undermines trust in the process.[9]

Thus, we held the Board erred by using its own method and ignoring *Hickel*.  For the sake of absolute clarity, we also rearticulated the Board's duties and our own role in the admittedly difficult process of redistricting:

We recognize that the Board is faced with a difficult task in attempting to harmonize the requirements of the Alaska Constitution and the Voting Rights Act. . . .  But these difficulties do not limit the Board's responsibility to create a constitutionally compliant redistricting plan, nor do they "absolve this court of its duty to independently measure each district against constitutional standards." . . .  The *Hickel* process is designed to "ensure that the requirements of article VI, section 6 of the Alaska Constitution are not unnecessarily compromised by the Voting Rights Act"; it may not be disregarded for reasons of expediency when drafting a permanent plan.[10]

In our order, we explicitly stated that reasons of difficulty or expediency do not justify deviating from the requirements of the Alaska Constitution.  Consequently, the Board was ordered to follow the *Hickel* process upon remand.[11]  We

---

[9]     *Id.* at 468.

[10]     *Id*. (quoting *In re 2001 Redistricting Cases*, 44 P.3d 141, 147 (Alaska 2002); *Hickel*) (footnotes omitted).

[11]     *Id*.

also acknowledged that time constraints may have complicated compliance with our order, and we approved the use of an interim plan if necessary:

> If the Board is unable to draft a plan that complies with this order in time for the 2012 elections, it may petition this court for an order that the 2012 elections be conducted using the Proclamation Plan as an interim plan. *But legislative districts for subsequent elections will be defined by the plan ultimately arrived at by the Board after following the Hickel process.*[12]

Thus, we notified the Board that we would not approve any final plan unless it was drafted according to the *Hickel* process.

The Board met from March 26 to March 31 to develop a new plan based on our order. The Board worked from what it termed a "*Hickel* template" that kept the unchallenged districts from its original Proclamation Plan because the Board claimed those districts "were drawn with only the Alaska Constitution in mind" and thus they complied with the *Hickel* process.[13] The Board's template omitted regions from the original Proclamation Plan that had been challenged, including House Districts 1-5 (Fairbanks City and FNSB); 36 (Bristol Bay and Aleutians East Borough); 37 (Bethel and Aleutians West Borough); 38 (Wade Hampton and Denali); and 39 (Bering Straits

---

[12]    *Id*. at 468-69 (emphasis added).

[13]    But in describing the process used to construct the Proclamation House Plan — which served as the template for the Amended Proclamation Plan — the Board began its explanation with the following language: "In order to maintain the requisite number of Alaska Native districts, . . .". Thus, it appears that at least three of these template districts were drawn with or approved with VRA requirements in mind: House District 40, which was intended to be one of the five effective Native districts, and House Districts 32 and 34, which were drawn under the assumption that a Native influence district had to be maintained in Southeast Alaska. (*See infra* n.14 for a definition of "Native influence district.") The Board claims that while House District 40 is a Native district, it was not "built on Voting Rights Act grounds" because it was unchanged from the 2002 redistricting plan.

and Interior Villages). After developing the template, the Board created four plans using that template and reviewed each for compliance with the Alaska Constitution. The Board adopted one of these plans, finding that each house district within was "contiguous, relatively compact and . . . socio-economically integrated." While the Board undertook this process and discussed its chosen plan with its VRA expert, third-party organizations submitted five alternative plans. The Board discussed each of these third-party plans and rejected them; it then adopted an amended version of its chosen plan. Eventually, the Board's modified plan became the Amended Proclamation Plan, and the Board unanimously adopted its written findings in support of this plan on April 5, 2012. This plan was then submitted to the superior court for approval as a final redistricting plan.

On April 16, 2012, seven parties and amici filed objections to the Board's Amended Proclamation Plan; among other deficiencies, each objector argued the Board ignored the *Hickel* process by maintaining the original Proclamation Plan's unchallenged districts when creating its template instead of beginning with a clean slate. In response to this objection, the Board argued that it was "under no obligation to redraw every House district, especially ones that already complied" with the Alaska Constitution. On April 20, 2012, the superior court issued an order denying the Board's request for approval of the Amended Proclamation Plan; among other issues, the superior court found that the Amended Proclamation Plan violated *Hickel* because the Board assumed that its unchallenged districts were constitutional, and it failed to redraw Southeast Alaska even though these districts were created to comply with the Board's assumption that it had to maintain a Native influence district.[14] The superior court declared:

_____

[14]     The superior court defined a "Native influence district" as a district "where Natives are able to influence the election but cannot elect a candidate of their choice

(continued...)

-9-                                                                                              6741

> Instead of redrawing a new plan that focused on the Alaska Constitution, there is no dispute that the Board used most of the districts from the [original] Proclamation Plan, with the exception of the districts in Fairbanks and districts that were created to satisfy the Voting Rights Act. . . . The court finds that the Board's method did not comply with either the spirit or the letter of the Alaska Supreme Court's order and the *Hickel* process.

The superior court also concluded that the Board first had to submit a plan to the court that complied with the Alaska Constitution without regard for the VRA, and only after the superior court evaluated and approved this *Hickel* plan would it then be remanded to the Board to make modifications necessary for VRA compliance.

The Board asked us to review the superior court's decision, but due to pending election deadlines, it also asked us to approve an interim plan for the 2012 elections. Extensive litigation ensued regarding the Board's interim plan, and we ultimately issued two orders adopting the Board's Amended Proclamation Plan as the interim plan.

Our order approving this interim plan once again reiterated that the Board would have to follow the *Hickel* process before we would approve a final plan:

> The Board's petition for review from the superior court's order of April 20, 2012, has been submitted to this court and remains under advisement. One of the issues raised by the petition for review is whether the Redistricting Board failed to comply with the *Hickel* process as mandated by this court's order of March 14, 2012, with respect to the Southeast

---

**14**      (...continued)
without the help of crossover votes" from non-Natives. *See also Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (defining "influence district" as "one in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected").

Alaska districts.  Our order of May 10, 2012 is premised on the conclusion that the Board did not so comply.

We now address the Board's petition for review from the superior court's order rejecting the Amended Proclamation Plan as a final redistricting plan.

## III.   STANDARD OF REVIEW

Under article VI, section 11 of the Alaska Constitution, the superior court has original jurisdiction over lawsuits to "compel correction of any error in redistricting" and, on appeal, "the cause shall be reviewed by the supreme court on the law and the facts."[15]  We review redistricting plans "in the same light as we would a regulation adopted under a delegation of authority from the legislature to an administrative agency to formulate policy and promulgate regulations."[16]  We review the plan to ensure that the Board did not exceed its delegated authority and to determine if the plan is "reasonable and not arbitrary."[17]  We may not substitute our judgment as to the sagacity of a redistricting plan for that of the Board, as the wisdom of the plan is not a subject for review.[18]  Our review is meant to ensure that the Board's Proclamation Plan is not unreasonable and is constitutional under article VI, section 6 of the Alaska Constitution.[19]

---

[15]     As to "the weight to be given to the decision of the superior court," we said in *Groh v. Egan*, 526 P.2d 863, 867 (Alaska 1974), that we review redistricting plans "de novo upon the record developed in the superior court."

[16]     *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1357 (Alaska 1987) (quoting *Carpenter v. Hammond*, 667 P.2d 1204, 1214 (Alaska 1983)).

[17]     *Id*. (quoting *Carpenter*, 667 P.2d at 1214).

[18]     *Id*. at 1357-58 (quoting *Carpenter*, 667 P.2d at 1214).

[19]     *Id*. at 1358 (quoting *Carpenter*, 667 P.2d at 1214).

## IV. DISCUSSION

### A. The Board Did Not Comply With The *Hickel* Process When Formulating Its Amended Proclamation Plan.

The Board claims that it has followed our instructions to use the *Hickel* process upon remand and asks us to approve its Amended Proclamation Plan as the final redistricting plan. But it is undisputed that the Board began formulating its original proclamation plan by focusing exclusively on race and creating the correct number of effective Native districts. Thus, upon remand, the Board was instructed to consider the requirements of the Alaska Constitution *first* when constructing districts.[20] However, what the Board actually did upon remand was to create a *Hickel* template that maintained the boundaries of unchallenged districts from the original Proclamation Plan, resulting in 22 unchanged house districts. The Board asserts that these districts "were drawn with only the Alaska Constitution in mind" and thus they complied with the *Hickel* process.[21]

The superior court interpreted our March 14, 2012 order as an instruction to the Board to begin its drafting process anew. The superior court found that "[i]nstead of redrawing a new plan that focused on the Alaska Constitution, there is no dispute that the Board used most of the districts from the [original] Proclamation Plan" and that this "method did not comply with either the spirit or the letter of the Alaska Supreme Court's order and the *Hickel* process."

We agree with the superior court that *Hickel* and our order mandated that the initial map drawn by the Board should not be affected by VRA considerations in any way, and therefore, the Board's Amended Proclamation Plan was noncompliant. We

---

[20] *In re 2011 Redistricting Cases*, 274 P.3d 466, 467 (Alaska 2012).

[21] At least three of these template districts were drawn or approved with VRA requirements in mind. *See supra* note 13.

have already held that the Board began drawing its original Proclamation Plan by creating VRA-compliant districts, a process that necessarily affected the contours of the entire map.[22] By adopting districts affected by the Board's initial VRA considerations, the Board's *Hickel* template limited its available options. As the amici usefully put it, on remand the Board "painted itself into a corner" by leaving only a few blank areas on the map. This structure limited the Board's ability to consider a wide range of plans to achieve maximum constitutional compliance; notably, each of the Board's four *Hickel* options was aimed at addressing the same population shortfall issue in a single rural district.

Moreover, when the Board first created these 22 districts, it did so in order to comply with the VRA; this is a clear violation of *Hickel*'s plain language. Although these districts went unchallenged, that does not change the fact that they were drawn with VRA considerations as the first priority. We do not know if these districts will meet the Alaska Constitution's requirements of compactness, contiguity, and socio-economic integration, but they were not drawn with this purpose as the primary consideration. Without a plan that does so, it is impossible to measure if deviations from Alaska constitutional requirements were necessary. Consequently, there is nothing to show that if the Board had considered the Alaska constitutional requirements first, as instructed, these districts would have remained the same. The Board's failure to follow the *Hickel* process has therefore precluded meaningful judicial review.

**B.    The Board Does Not Need To Make Specific Findings About Each Individual District Relating To The Requirements Of The Alaska Constitution.**

---

[22]    *In re 2011 Redistricting Cases*, 274 P.3d at 467.

The Board challenged the superior court's ruling that required the Board to make specific findings regarding each individual house district. The superior court seemed to derive its conclusion from the following passage of our March 14 order: "[T]hese difficulties do not limit the Board's responsibility to create a constitutionally compliant redistricting plan, nor do they 'absolve this court of its duty to independently measure each district against constitutional standards.' "[23] Based on this language, the superior court reasoned that the Board was required to submit district-specific findings so that we could measure the constitutionality of each district. The Board argues that this ruling is the "epitome of form over substance, and creates a mandate obviously absent from [our] order." The Board also highlighted its express finding that all 40 house districts in the Amended Proclamation Plan were constitutionally compliant.

There is no indication in the *2001 Redistricting* order or in our March 14 order that our duty to measure each district for constitutional compliance creates a corresponding requirement that the Board make individual findings regarding each district's constitutionality. In our March 14 order we "recommend[ed] that the Board make findings, in furtherance of the *Hickel* process, that the initially designed plan complies with the requirements of the Alaska Constitution . . . ."[24] Our recommendation did not extend to findings about each district. The Board is not required to specifically find that each district in its *Hickel* plan complies with the Alaska Constitution.

C. **The Board Need Not Submit A Plan To The Superior Court At Each Stage Of Drafting.**

---

[23] *Id*. at 468 (quoting *In re 2001 Redistricting Cases*, 44 P.3d 141, 147 (Alaska 2002)).

[24] *Id*. at 468 n.15.

The Board also challenged the superior court's ruling that it must submit a *Hickel* plan to that court for approval before creating a final plan. The superior court stated in its April 20, 2012 order that it must "receive a plan from the Board that complies with the Alaska Constitution before considering any need to meet any VRA requirements." Once the superior court approved the plan, "the matter will be remanded again to the Board" to develop a plan that deviates from the requirements of the Alaska Constitution only when necessary for VRA compliance. The Board argues that this ruling has no support in the detailed mandates of the Alaska Constitution and our prior case law. It also contends that the superior court created "a completely new, unprecedented level of court involvement in the redistricting process" without establishing "just how and when this review is supposed to occur in future redistricting cycles."

Neither *Hickel* nor the March 14 order expressly or impliedly requires the Board to submit its *Hickel* plan for superior court ratification before proceeding to weigh VRA compliance. Article VI, sections 10 and 11 of the Alaska Constitution delineate the process the Board must follow in developing a proclamation plan and the contours of judicial review, and nowhere do these provisions suggest a two-stage review is required. Therefore, we hold that the Board is not required to submit its initial *Hickel* plan to the superior court for ratification.

## D.     All Other Claims Raised In This Petition for Review Are Moot.

The Board also challenged the superior court's rulings that the configuration of certain house districts that deviated from the requirements of the Alaska Constitution were not necessary for compliance with the VRA. Since we find the Board did not comply with the *Hickel* process in formulating its plan, we need not reach these

claims as these districts may have a completely different configuration in the new plan the Board will have to create, and therefore, these claims are moot.

## V.   CONCLUSION

Because the Board failed to follow the *Hickel* process when drafting its Amended Proclamation Plan, we AFFIRM the superior court's ruling invalidating that plan and REMAND this case to the Board to draft a new plan based on strict adherence to the *Hickel* process. We REVERSE the superior court's rulings that the Board must make specific findings on the constitutionality of each house district and that the Board must submit the plan to the court for approval at each stage of drafting.

WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting in part.

I agree that the Alaska Redistricting Board did not follow the instructions set out in our March 14, 2012, order and therefore agree to affirm that point of Judge McConahy's remand order. It appears the Board considered our order to be form over substance and reformulated its packaging rather than its plan.

I also agree that, at this juncture, it was error for the superior court to require the Board to submit an initial plan, based solely on the Alaska Constitution, for court approval before making any necessary adjustments to satisfy federal voting law requirements. I therefore agree to reverse that point of Judge McConahy's remand order. But I note that the Board's further failure to comply with the *Hickel* process[1] might justify such a requirement.

I disagree with the conclusion that the Board should not, at this juncture, be required to make specific district-by-district findings regarding the three factors constitutionally mandated for a redistricting plan: contiguity, compactness, and relative socio-economic integration.[2] Having twice failed to follow the *Hickel* process, the Board should be required to make findings allowing appropriate judicial review of its determinations. I therefore would affirm this point of Judge McConahy's remand order. But I make the following observations in this regard. First, conclusory "findings" on the three factors underlying a constitutional redistricting plan are not particularly helpful, especially with regard to comparative socio-economic integration.[3] Second, whether a

_____

[1] *Hickel v. Se. Conference*, 846 P.2d 38, 51 n.22 (Alaska 1992).

[2] Alaska Const. art. VI, § 6.

[3] *Id*. (stating that the contiguous and compact districts must "contain as nearly as practicable a relatively integrated socio-economic area"). *See Hickel*, 846 P.2d at 46-47 (describing characteristics of socio-economic integration and emphasizing that
(continued...)

redistricting plan ultimately complies with the Alaska Constitution is not a question of fact; it is a question of law subject to independent review by the judiciary — I would give no deference to a Board "finding" that its redistricting plan complies with the Alaska Constitution when our role is to "review [a] redistricting plan[] 'de novo upon the record developed in the superior court' "[4] to ensure that the plan "is not unreasonable and is constitutional under the provisions of Article VI, section 6 of Alaska's constitution."[5]

---

[3] (...continued) "relatively" requires comparisons with previously existing and proposed districts as well as principal alternative districts).

[4] *In re 2001 Redistricting Cases*, 47 P.3d 1089 (Alaska 2002) (quoting *Groh v. Egan*, 526 P.2d 863, 867 (Alaska 1974)).

[5] *Carpenter v. Hammond*, 667 P.2d 1204, 1214 (Alaska 1983) (citing *Acker v. Love*, 496 P.2d 75 (Colo. 1972)).

MATTHEWS, Senior Justice, with whom FABE, Justice, joins, dissenting.

The main question under review is whether the Alaska Redistricting Board complied with our order concerning the *Hickel* process when it used unchallenged districts or whether the Board should have begun the redistricting process anew. Today's opinion concludes that a fresh start was required. I disagree and believe that the Board's approach was practical and reasonable.

## A.  Actions Taken By The Board On Remand

The underlying problem facing the Redistricting Board was the difficulty of complying with both the federal Voting Rights Act and the redistricting criteria set out in article VI, section 6 of the Alaska Constitution. The purpose of the Voting Rights Act is to protect the voting power of racial minorities. A reapportionment plan is invalid under section 5 of the Act if it leads to "retrogression" in the relative position of racial minorities with respect to their effective exercise of the electoral franchise.[1] The redistricting criteria of article VI, section 6 of the Alaska Constitution require that each house district "shall be formed of contiguous and compact territory" that contains "as nearly as practicable a relatively integrated socio-economic area."[2] Because the federal Act has priority, sometimes the Alaska redistricting criteria must be compromised in order to avoid retrogression.

To ensure that the Redistricting Board does not unnecessarily deviate from Alaska constitutional standards in order to comply with the Voting Rights Act we directed the Board in *Hickel v. Southeast Conference* to follow the procedure that now bears the name of that case. We stated in *Hickel*:

---

[1]  *Hickel v. Se. Conference*, 846 P.2d 38, 49 (Alaska 1992).

[2]  Alaska Const. art. IV, § 6.

The board must first design a reapportionment plan based on the requirements of the Alaska Constitution. That plan then must be tested against the Voting Rights Act. A reapportionment plan may minimize article VI, section 6 requirements when minimization is the only means available to satisfy Voting Rights Act requirements.[3]

The Redistricting Board in the present case did not follow the *Hickel* process in formulating the original Proclamation Plan.[4] This failure was challenged by Riley in his petition for review from the superior court's initial decision on the merits. In our order of March 14, 2012 we agreed with Riley that the Board had erred in failing to comply with the *Hickel* process.

We explained:

The *Hickel* process provides the Board with defined procedural steps that, when followed, ensure redistricting satisfies federal law without doing unnecessary violence to the Alaska Constitution. The Board must first design a plan focusing on compliance with article VI, section 6 requirements of contiguity, compactness, and relative socioeconomic integration; it may consider local government boundaries and should use drainage and other geographic features in describing boundaries wherever possible. Once such a plan is drawn, the Board must determine whether it complies with the Voting Rights Act and, to the extent it is noncompliant, make revisions that deviate from the Alaska Constitution when deviation is "the only means available to satisfy Voting Rights Act requirements."[5]

We remanded this case to the Board to comply with the *Hickel* process.

---

[3] 846 P.2d at 51 n.22.

[4] A map of the original Proclamation Plan is attached as Appendix A.

[5] *In re 2011 Redistricting Cases*, 274 P.3d 466, 467-68 (Alaska 2012) (quoting *Hickel*, 846 P.2d at 51 n.22).

On remand, the Board reconvened on March 26 and met continuously for six days. After considering four options, the Board settled on a *Hickel* plan, that is, a plan designed to comply with Alaska constitutional criteria.[6] The Board then conducted an analysis to determine whether the plan would be considered retrogressive under the Voting Rights Act. The Board determined that its *Hickel* plan would be considered retrogressive and would not be granted preclearance by the Department of Justice. The Board then examined various options for changing the *Hickel* plan in order to comply with the Voting Rights Act. After deliberating on many options and plans submitted by numerous interest groups, the Board adopted the Amended Proclamation Plan on April 5, 2012.[7]

The Board described in a written report the process it used to adopt the *Hickel* plan. The Board first asked its staff to design several *Hickel* plans for its consideration. As a basis for drafting the various options, the staff was instructed to create what the Board called the "*Hickel* template." The template consisted of election districts from the original Proclamation Plan that were designed to comply with Alaska redistricting criteria independent of Voting Rights Act considerations.[8]

The *Hickel* template left space for four undrawn districts in rural Alaska. These districts encompassed a very large area, more than half the state geographically, and they became Districts 36, 37, 38, and 39 under the Board-adopted *Hickel* plan. Because these four undrawn districts only had sufficient population for about 3.5 House districts, substantial population needed to be added from an urban area of the state to at

---

[6]     A map of the *Hickel* plan is attached as Appendix B to this opinion.

[7]     A map of the Amended Proclamation Plan is attached as Appendix C to this opinion.

[8]     A map of the *Hickel* template is attached as Appendix D to this opinion.

least one of the rural districts. In order to decide what to adopt as its *Hickel* plan, the Board considered four provisional plans created by its staff that took population respectively from the urban areas of Fairbanks, the Matanuska-Susitna Borough, Anchorage, and the Kenai Peninsula Borough. The three latter plans crossed the template boundaries in various ways. After considerable deliberation, the Board settled on the option that took population from suburban Fairbanks and adopted the *Hickel* plan.[9] One advantage of resolving the rural population shortfall by taking population from the Fairbanks North Star Borough was that this area had excess population equivalent to about one-half a district that had to be accommodated in some way.

Set forth here are the Board's findings concerning adoption of the *Hickel* plan:

1. As a starting point for complying with the *Hickel* Process, Board staff was tasked with designing several "*Hickel* Plans" for consideration by the Board.

2. In creating these plans, Board staff was instructed to create a "*Hickel* Template" as the basis for drafting the various options. The *Hickel* Template does not change those election districts from the Proclamation Plan that: (1) were constructed to comply [with] Alaska constitutional redistricting requirements without reference to the [Voting Rights Act]; and (2) were either not subject to, or directly or indirectly, affected by any successful legal challenge. Statewide and regional maps of the *Hickel* Template were posted on the Board's website and are part of the Board record.

3. Under the *Hickel* Template, there were four undrawn election districts in rural Alaska that needed to be created. Based on the census data, Board staff determined

---

[9]     *See* Appendix C.

that to create four "ideal" election districts, requires a population of 71,020 (17,755 x 4).

a.     To draw these districts at deviations of -5.0% requires a population of 67,468.

b.     The undrawn areas had a population of 62,240 or enough population for approximately 3.5 House Districts.

c.     Thus, in order to comply with the equal population requirements of art. VI, sec. 6, substantial population needed to be added from some urban area of the state to at least one rural district. The requirement of adding urban population to a rural district is, as noted by both the trial court and the Supreme Court, not a matter of "if" but only a matter of "where" and has nothing to do with the requirements of the [Voting Rights Act].

4.     In order to resolve the rural population shortfall, staff was instructed to attempt to design *Hickel* Plans that took population out of the four urban areas of the state: Fairbanks, the Mat-Su Borough, Anchorage, and Kenai.

5.     On March 26, 2012, the Board reviewed, considered and discussed on the record three *Hickel* Plans created by Board staff referred to as "*Hickel* 001," "*Hickel* 002" and "*Hickel* 003." These plans solved the rural population shortfall by taking population out of Fairbanks, Mat-Su, and Anchorage, respectively. Another plan, "*Hickel* 004", which took urban population from Kenai, was presented to the Board on March 27, 2012. Copies of all four *Hickel* Plans were posted on the Board's website and are part of the Board record.

6.     After discussion, the Board instructed its counsel to review the proposed *Hickel* Plans for compliance with the Alaska Constitution.

7.     On March 27, 2012, counsel for the Board provided the Board with a written memorandum setting forth

his analysis of the four proposed *Hickel* Plans. A copy of this memorandum was posted on the Board's website and is part of the Board record. Board counsel also explained his analysis on the record and answered questions from Board members.

a.      Board counsel's analysis determined that the *Hickel* 001 plan complied with the requirements of art. VI, sec. 6 of the Alaska Constitution.

b.      Board counsel's analysis determined that each of the other three *Hickel* Plans did not comply with the requirements of art. VI, sec. 6 of the Alaska Constitution for the reasons set forth in Board counsel's memorandum and as explained on the record.

8.      After discussion and deliberation, the Board unanimously adopted by a 5-0 vote the "*Hickel* 001" plan as its "*Hickel* Plan" for purposes of the *Hickel* Process.

9.      The Board's *Hickel* Plan complies with the requirements of the Alaska Constitution. All forty (40) of the House districts are contiguous, relatively compact and, as nearly as practicable, socio-economically integrated. The Plan has an overall deviation of 8.93% which is within the equal population requirements of art. VI, sec. 6 of the Alaska Constitution. Each of the Senate districts is composed of two contiguous House districts.

The Board next turned to the question of whether the *Hickel* plan it adopted complied with the Voting Rights Act. Dr. Lisa Handley, the Board's expert consultant, studied the *Hickel* plan and came to the conclusion that it was retrogressive and would not be approved by the Department of Justice. Dr. Handley explained that the original Proclamation Plan[10] had five "effective" (or "ability to elect") Alaska Native state House

---

[10]      Which the Department of Justice had already approved and therefore would
(continued...)

districts: Districts 36, 37, 38, 39, and 40. All of these districts were majority Native population districts, but two of them, 37 and 38, had only approximately 46% Alaska Native voting age population (NVAP).[11] Dr. Handley also explained that the original Proclamation Plan contained three effective Senate districts: two majority Alaska Native Senate districts, Districts T and S, and Senate District R with a 43.75% NVAP.[12] But, because the *Hickel* plan contained one fewer effective House district and one fewer effective Senate district, changes had to be made in order to comply with the Voting Rights Act and obtain preclearance from the Department of Justice.

How the *Hickel* plan should be changed to comply with the Voting Rights Act was much discussed by the Redistricting Board. The Board eventually decided that three of the districts in the *Hickel* plan, 37, 38, and 39, would have to be altered in order to create a fifth effective House district. Because Districts 38 and 39 had NVAPs of over 80%, and District 37 had an NVAP of only approximately 33%,[13] the reconfiguration would have to place many Alaska Native voters from Districts 38 and 39 into District 37, which in turn would be altered to place some non-Native voters into Districts 38 and 39. The Board's report states the problem as follows:

> In order to create a fifth effective House district, HD-37 in the *Hickel* plan must be substantially reconfigured and the two districts with over 80% Alaska Native Voting Age Population ("NVAP") — HD-39 with 84.22% NVAP and HD-38 with 82.65% NVAP — must be unpacked and the

---

[10]     (...continued)
serve as the benchmark for measuring retrogression.

[11]     This percentage was enough to make the districts effective.

[12]     This percentage was sufficient to make Senate District R effective.

[13]     Which would not be effective.

NVAP spread out in order to allow for the creation of a fifth effective House district.

Looking at the maps of the *Hickel* plan and the Amended Proclamation Plan, one can see that the "unpacking" process primarily entailed three steps. First, the Board combined the heavily NVAP Norton Sound and middle Yukon River areas with a region of rural eastern Alaska where Alaska Natives are not a majority to form District 39 in the Amended Proclamation Plan.[14] Second, the Yukon River Delta (the Wade Hampton census district) with its heavy NVAP (which was the southern part of District 39 under the *Hickel* plan) was extended east to encompass the primarily non-Native Denali Borough and the suburban Fairbanks areas of Ester and the Goldstream Valley to create House District 38 in the Amended Proclamation Plan.[15] Third, the remainder of District 38 in the *Hickel* plan was distributed to Districts 36 and 37 in the Amended Proclamation Plan.[16]

The creation of a third effective Senate district also required changes to what were Districts 36 and 38 in the *Hickel* plan. The Board adopted the so-called Bethel-to-Chain Plan (referring to the Aleutian Chain) which placed the City of Bethel in the same district with the Aleutians by creating a long coastal district, District 37, in the Amended Proclamation Plan.[17] The balance of the Bethel census area was packed into a district that includes areas of Southwest Alaska from Tyonek on Cook Inlet to King Salmon on the Alaska Peninsula. This newly configured district, District 36, had an NVAP of 81.01%. This high NVAP allowed District 36 to be paired with District 35,

---

[14] *See* Appendices B and C.

[15] *Id.*

[16] *Id.*

[17] *Id.*

the Kodiak and Central Coast district that had an NVAP of 17.55%, to create Senate District R with an NVAP of 47.76%.[18] According to Dr. Handley, the NVAP of Senate District R was then sufficient to create an effective Senate district.

After clearing the proposed changes with Dr. Handley, the Board adopted the Amended Proclamation Plan.[19] The Board found that the Amended Proclamation Plan departed from the Alaska constitutional requirements of article VI, section 6 "to the least degree reasonably necessary to ensure compliance with the [Voting Rights Act]." After making additional findings concerning the configuration of election districts in southeast Alaska, which I will discuss separately, the Board adopted the Amended Proclamation Plan by a unanimous 5-0 vote.

---

[18]    *Id*.

[19]    The Amended Proclamation Plan also altered House Districts 1 and 2 in the Fairbanks area in an effort to rectify the compactness problem found by the superior court. It also reconfigured to some extent all five of the House districts within the Fairbanks North Star Borough because of the ripple effect of the changes to Districts 1 and 2. Further, in order to resolve another point raised by Riley, the Amended Proclamation Plan distributed the excess population that remained after adding 5,757 Fairbanks North Star Borough residents to District 38 into districts wholly within the Fairbanks North Star Borough. The Amended Proclamation Plan also mooted another issue raised by Riley by pairing the two Fairbanks House districts together to form Senate District B rather than pairing each of them with a district outside the City of Fairbanks as had been done in the original Proclamation Plan.

**B.    Subsequent Proceedings In The Superior Court**

The City of Petersburg and the *Riley* plaintiffs immediately challenged the Amended Proclamation Plan in the superior court.[20] The City of Petersburg argued that the Board did not comply with the *Hickel* process with respect to House Districts 34 and 32 in southeastern Alaska because House District 34 in the original Proclamation Plan was designed to create a Native "influence" district and this design adversely affected the compactness of neighboring District 32 in which Petersburg is located. Since these districts were the same under both the original and amended Proclamation Plans and were not based solely on the requirements of the Alaska Constitution, Petersburg argued that the Redistricting Board had failed to comply with our order on remand requiring adherence to the *Hickel* process. As I discuss below, I think Petersburg's point is correct and this case should be remanded for the limited purpose of reconfiguring House Districts 32 and 34, as well as the other two districts in southeast Alaska, 31 and 33, if required because of a ripple effect.[21]

Riley raised a number of objections including an argument that the Board did not follow the *Hickel* process because it started with a plan that left 36 of the initial districts intact. Riley wrote:

> The process used by the Board was a process designed to
> limit and guide the Board by fixing 90% of the plan using

---

[20]    A number of the amici curiae did as well, sometimes on grounds separate from those raised by the parties. Such grounds need not be considered since "[i]t is well settled that courts will not consider issues raised by amici curiae which are not raised by the parties." *State, Dep't of Transp. & Pub. Facilities v. Fairbanks N. Star Borough*, 936 P.2d 1259, 1262 n.4 (Alaska 1997) (quoting *Hootch v. Alaska State-Operated Sch. Sys.*, 536 P.2d 793, 809 n.62 (Alaska 1975)).

[21]    A detailed map of these districts as they were configured under the Amended Proclamation Plan is attached as Appendix E. The configuration of these four districts was unchanged from the original Proclamation Plan.

districts from the previously invalidated plan, creating "*Hickel*" options that were clearly intended to be unconstitutional, and staff offering only one constitutional plan. The process was a guided staff dominated process that claimed to be a "*Hickel*" process, but lacked any substantive element of such a process.

The Board defended its decision to use most of the already-drawn districts on the grounds that they had been designed to comply with the Alaska constitutional criteria without consideration of Voting Rights Acts requirements. In addition, the Board argued that since the districts in the *Hickel* template had never been challenged, no new challenge would be timely since the 30-day deadline prescribed by article VI, section 11 of the Alaska Constitution had expired.[22]

---

[22] Article VI, section 11 provides in relevant part:

> Any qualified voter may apply to the superior court to compel the Redistricting Board, by mandamus or otherwise, to perform its duties under this article or to correct any error in redistricting. Application to compel the board to perform must be filed not later than thirty days following the expiration of the ninety-day period specified in this article. Application to compel correction of any error in redistricting must be filed within thirty days following the adoption of the final redistricting plan and proclamation by the board.

The Board also made the following argument:

> The *Hickel* template left Anchorage, Southeast, and the North Slope (Districts 12-27, 31-35, and 40) unchanged. The Board did not leave thirty-six districts unchanged as alleged by the objecting parties. This is evident by the fact that the Board changed all five of the Fairbanks districts, and made adjustments to districts in both the Kenai Peninsula Borough and the Mat-Su Borough.

The superior court ruled that the parties' objections that the *Hickel* process was not followed were well taken:

> Instead of redrawing a new plan that focused on the Alaska Constitution, there is no dispute that the Board used most of the districts from the Proclamation Plan, with the exception of the districts in Fairbanks and districts that were created to satisfy the Voting Rights Act.[4] . . . The court finds that the Board's method did not comply with either the spirit or the letter of the Alaska Supreme Court's order and the *Hickel* process.

_____

> [4] The Board also made adjustments to the districts in Kenai and Mat-Su due to population shift.

The Board has petitioned for review of this decision.

## C. The Board Complied With Our Order Concerning The *Hickel* Process, Except For Southeast Alaska.[23]

Today's majority opinion affirms the superior court to the extent that the court concluded that the Board failed to follow the *Hickel* process by using the unchallenged districts from the Proclamation Plan. The majority opinion's rationale is that the shape of the unchallenged districts was necessarily affected by the Board's initial decision to draft the original Proclamation Plan by addressing Voting Rights Act considerations first and therefore the "*Hickel* template limited its available options."[24] The majority states that by adopting the *Hickel* template "the Board 'painted itself into a corner' by leaving only a few blank areas on the map. This structure limited the Board's ability to consider a wide range of plans to achieve maximum constitutional

_____

[23] The southeast districts are discussed in subsection D of this dissenting opinion.

[24] Slip Op. at 12.

compliance; notably, each of the Board's four *Hickel* options was aimed at addressing the same population shortfall issue in a single rural district."[25]  This rationale leads the majority to conclude that the Board did not comply with the *Hickel* process when it maintained the original Proclamation Plan's unchallenged districts, and that the Board should have begun with a clean slate.

To explain why I reach a different conclusion, I begin with the language of our order of March 14, 2012.  In paragraph 11 of the order we directed the Board on remand to "follow the *Hickel* process."[26]  In paragraph 5 of the order we described the *Hickel* process as mandating that the Board first "design a reapportionment plan based on the requirements of the Alaska Constitution."[27]  Thus, to belabor the obvious, what we required the Board to do was "design a reapportionment plan based on the requirements of the Alaska Constitution."  If the *Hickel* plan complied with the requirements of the Alaska Constitution, the Board did what we asked it to do.  Today's opinion declines to answer whether the Board's *Hickel* plan meets Alaska constitutional criteria.[28]  I agree that this is a question that remains to be resolved.[29]

---

[25]    *Id.*

[26]    *In re 2011 Redistricting Cases*, 274 P.3d 466, 468 (Alaska 2012).

[27]    The full quote is:  "After receiving the decennial census data, '[t]he Board must first design a reapportionment plan based on the requirements of the Alaska Constitution.' "

[28]    Slip Op. at 13 ("We do not know if these districts will meet the Alaska Constitution's requirements of compactness, contiguity and socio-economic integration . . . .").

[29]    The Board in its petition asks us to assume jurisdiction of this and other remaining questions in the interest of judicial economy and expediting the final decision in this case.  I think it would be reasonable to grant this request and invite additional

(continued...)

The premise of the majority's opinion is that the Board unduly limited its ability to craft a *Hickel* plan by starting with the *Hickel* template. Today's opinion refers to the Board's actions as "leaving only a few blank areas on the map."[30] But reference to the *Hickel* template, Appendix D, immediately calls into question the characterization of the undistricted space as "a few blank areas." The template left blank a huge contiguous area that constitutes more than half the land mass of the State of Alaska. Within this Texas-sized area the Board obviously had numerous redistricting options.

Further, the Board was not constrained by the *Hickel* template. The Board considered three alternatives to its *Hickel* plan, each of which ignored the template boundaries in different ways. For example, in what the Board called the "*Hickel* 003 Plan" the Board considered taking the needed urban population from the western portion

---

[29]    (...continued)
briefing on the issue of the *Hickel* plan's compliance with Alaska constitutional requirements as well as all other outstanding issues.

The standard of review that should be employed in review of the *Hickel* plan would also have to be addressed. Under article VI, section 11 any challenges to districts contained in a final plan must be brought within 30 days after adoption of the plan by the Board. Districts that are unchallenged within that period are immune from challenge within the next decennial cycle. Arguably, and most deferentially, since any unchallenged district is good enough for voting purposes, it should be considered good enough for purposes of the *Hickel* process. At the other end of the spectrum, the least deferential standard would review all districts for *Hickel* process compliance de novo — the same standard that would be used if timely challenges had been made under article VI, section 11. But the first standard may be seen as too restrictive for the *Hickel* process to have much significance, and the de novo standard ignores the purpose and effect of the 30-day constitutional limit. The best standard might be one which asks whether the unchallenged districts in a *Hickel* process plan can reasonably be viewed as complying with constitutional redistricting requirements. Such a standard would allow the *Hickel* process to remain useful, while protecting districts that should be constitutionally unchallengeable from being disturbed except in clear cases.

[30]    Slip Op. at 13.

of the Municipality of Anchorage and including it in a district with rural villages that stretched from Cook Inlet to Bethel in western Alaska. The other two options likewise were not constrained by the template boundaries. The so-called *Hickel* 002 Plan added population from the Matanuska-Susitna Borough — including Talkeetna and Willow — to a large interior district. *Hickel* 004 added population from the northern portion of the Kenai Peninsula (the Nikiski area) to a district that ran from the western shore of Cook Inlet to the mouth of the Kuskokwim River.[31]

Thus, the *Hickel* template, the structure chosen by the Board, did not limit the Board's ability to consider alternative plans. We can say this with confidence because the Board in fact considered alternative plans that were not constrained by the template.

In addition, there are practical reasons that support the Board's decision to use unchallenged districts when it constructed its *Hickel* plan rather than to start from scratch.

First, beginning the *Hickel* process with unchallenged districts was desirable because the Amended Proclamation Plan, so based, could be in place in time for the 2012 elections and could be used for all of the subsequent elections in the

---

[31]  The majority opinion states that "notably, each of the Board's four *Hickel* options was aimed at addressing the same population shortfall issue in a single rural district." Slip Op. at 13. This should not be read as implying that the population shortfall would be added to *the same* rural district, for that was not the case. One may question why the majority finds it to be "notable" that in each of the *Hickel* options an urban area contributed to only one rural district. Of course the Board might also have considered options that scattered the population shortfall from one or several urban areas among several rural areas, but to suggest that the Board had a duty to do so would be, it seems to me, an unwarranted invasion of the Board's prerogatives. Further, if the Board had scattered smaller urban population blocks among several rural districts substantial claims of voter dilution would be presented.

decennial cycle. This would have been an impossibility if the Board had started with newly drawn districts because new districts would have created new controversies with new parties, just as every new redistricting has done. By contrast, new challenges to the districts built into the *Hickel* template were already barred by the 30-day period of limitations expressed in article VI, section 11 of the Alaska Constitution.

Second, the unchallenged districts had already been reviewed through the public hearing process required by article VI, section 10 of the Alaska Constitution. Starting anew would have negated the value of these hearings, and might have required new hearings.

Underlying these reasons is the fact that it is highly desirable that election districts not change, or change as little as possible, from one election to the next during every ten-year census cycle. Redistricting inevitably generates significant political disruption and voter confusion, and gives rise to charges of partisan and *ad hominem* gerrymandering. It results in the truncation of four-year senate terms to two-year terms when there are substantial changes in a Senate district. Further, redistricting may place two incumbents in one district, thus resulting in the inevitable defeat of one of them. In addition, redistricting may cause incumbents to lose the core of their constituency.

In recognition of the undesirable effects of unnecessary redistricting, the Alaska Constitution contains provisions designed to ensure that one redistricting plan will be effective for the whole of a census cycle. The tight deadlines in article VI, section 10[32] are designed to achieve this goal. They require the adoption of a preliminary

---

[32]    Article VI, section 10 provides:

    (a)    Within thirty days after the official reporting of the decennial census of the United States or thirty days after being duly appointed, whichever occurs last, the board shall

(continued...)

plan within 30 days after the Board has been appointed or the census has been reported, whichever is later, and a final plan within 90 days thereafter. The plan is to be effective for the next ten years. It "shall be effective . . . until after the official reporting of the next decennial census of the United States."[33] Similarly, the strict deadlines of article VI, section 11[34] likewise are designed to produce a final plan that will serve for the entire

---

[32]   (...continued)
adopt one or more proposed redistricting plans. The board shall hold public hearings on the proposed plan, or, if no single proposed plan is agreed on, on all plans proposed by the board. No later than ninety days after the board has been appointed and the official reporting of the decennial census of the United States, the board shall adopt a final redistricting plan and issue a proclamation of redistricting. The final plan shall set out boundaries of house and senate districts and shall be effective for the election of members of the legislature until after the official reporting of the next decennial census of the United States.

(b)    Adoption of a final redistricting plan shall require the affirmative votes of three members of the Redistricting Board.

[33]   *Id*.

[34]   Article VI, section 11 provides:

Any qualified voter may apply to the superior court to compel the Redistricting Board, by mandamus or otherwise, to perform its duties under this article or to correct any error in redistricting. Application to compel the board to perform must be filed not later than thirty days following the expiration of the ninety-day period specified in this article. Application to compel correction of any error in redistricting must be filed within thirty days following the adoption of the final redistricting plan and proclamation by the board.

(continued...)

census cycle. Thus, under section 11, suits challenging a plan must be filed no later than 30 days following the adoption of the plan. Further, all decisions by the superior court and the supreme court concerning such challenges "shall be expedited and shall have priority over all other matters pending before the respective court."[35]

For the above reasons, I think that the majority opinion is mistaken in concluding that the Board unduly limited its range of choices by adopting the *Hickel* template.[36] The Board considered options outside the template.[37] Further, the Board's

---

[34] (...continued)
Original jurisdiction in these matters is vested in the superior court. On appeal from the superior court, the cause shall be reviewed by the supreme court on the law and the facts. Notwithstanding Section 15 of Article IV, all dispositions by the superior court and the supreme court under this section shall be expedited and shall have priority over all other matters pending before the respective court. Upon a final judicial decision that a plan is invalid, the matter shall be returned to the board for correction and development of a new plan. If that new plan is declared invalid, the matter may be referred again to the board.

[35] *Id.*

[36] The majority's opinion identifies only three of the template districts that it claims were drawn or approved with Voting Rights Act requirements in mind, House Districts 32 and 34 in southeast Alaska, and House District 40 encompassing the North Slope Borough and the Northwest Arctic Borough. Slip Op. at 8 n.13. As explained in part D of this dissenting opinion, I agree that District 34 was given a non-compact shape in order to comply with what were thought to be Voting Rights Act requirements. This decision in turn affected the shape of District 32 and probably District 33. But I do not think that the shape of District 40 was affected by Voting Rights Act considerations. That district in terms of contiguity, compactness, relative socioeconomic integration, and adherence to local government boundaries and major drainage features is about as ideal as any Alaska rural district could be. In stating that House District 40 was drawn or
(continued...)

(...continued)

approved with Voting Rights Act requirements in mind, the majority opinion cites the preclearance submission of August 9, 2011 made by the Board to the Department of Justice concerning the original Proclamation Plan. But the submission itself indicates only that the Board was aware that District 40 would comply with the Voting Rights Act, not that the shape of District 40 was influenced by Voting Rights Act considerations. Here is all the Board said concerning House District 40 in the submission — I add emphasis where mention is made of District 40:

> *The Proclamation House Plan includes five districts where Alaska Natives constitute a majority of the total population*: District 36 with 78.26%; 37 with 56.18%; 38 with 53.38%; 39 with 72.50%; *and 40 with 71.15%. While only three of these districts retain their majority Alaska Native status when voting age population statistics are considered —* District 36 with 71.45% VAP, 39 with 67.09% VAP, *and 40 with 62.22% VAP —* the other two districts, 37 and 38, likely remain "effective". Both have Alaska Native VAP over 4.46% higher than the 41.8% statewide target effectiveness standard. Moreover, District 37 is only 26.65% white VAP. As discussed further below, the non-Alaska Native population added to District 38 was specifically chosen in order to enhance the effectiveness of that District for Alaska Natives to elect their preferred candidate.
>
> In order to maintain the requisite number of Alaska Native districts and still meet the one person, one vote standard, the configuration of the Benchmark House Plan had to be substantially changed. [See Appendix C to Dr. Handley's report, found in Volume 1, Folder 6, for a map that compares the Benchmark and Proclamation districts.] *District 40 in the Proclamation House Plan remains essentially intact. The Alaska Native VAP percentage declines only slightly from 63.60% to 62.22%.* In order to construct a plan that avoided retrogression, however, it was necessary for the Board to unpack two of the other Benchmark House districts with substantial Alaska Native Populations, Districts 38 and

(continued...)

decision to use as many unchallenged districts as possible in its *Hickel* plan was reasonable and practical because that was the only course of action that could have resulted in a plan that could be employed for every election in this census cycle.

**D.      With Respect To Districts 32 And 34 In Southeast Alaska The Board Did Not Comply With Our Order Concerning The *Hickel* Process.**

I agree with the majority opinion that, as to House Districts 32 and 34 in southeast Alaska, the Board did not comply with the *Hickel* process.[38] As the majority opinion states, these districts were drawn under the assumption that a Native "influence" district had to be maintained in southeast Alaska in order to comply with the Voting Rights Act.

On remand from our order of March 14, 2012, the Board took the position that it did not have to revisit the configuration of the districts in southeast Alaska. This

---

[36]      (...continued)

39. . . .

By suggesting that District 40 did not comply with the *Hickel* process merely because the Board was aware when it  approved the district that it would meet Voting Rights Act requirements — even though the boundaries of the district were not shaped in order to meet Voting Rights Act requirements — the majority opinion seems to be policing abstract thought rather than conduct.  In my view this is unjustified.  Moreover, it is worth considering whether on remand the Board will be precluded from replicating House District 40 in its current and nearly ideal form, and instead must select a different, and likely inferior, shape in order to purge the impermissible taint found by today's opinion.

[37]      Perhaps what the majority is concluding is that considering only three *Hickel* plan options outside the template was not enough.  But surely such decisions are properly left to the discretion of the Board.  We said nothing about the number of plans the Board should consider in our order of remand, only that the Board should design *a* plan based on the requirements of the Alaska Constitution.

[38]      *See* Slip Op. at 8 n.13.  A map of these districts appears at Appendix E to this dissenting opinion.

was based on a ruling made by the superior court in response to the City of Petersburg's motion for summary judgment in which the superior court held that District 32 is "compact enough" to satisfy the requirements of the Alaska Constitution. But as the superior court later pointed out, in its order of April 20, 2012, this conclusion was only reached in light of the court's assumption that the Voting Rights Act required a Native influence district in southeast Alaska. The superior court stated:

> While the court previously did rule that House District 32 in Southeast was "compact enough," this was in light of the Board's argument that departure from strict adherence to the compactness requirement is justified by its need to draw a redistricting plan that avoids retrogression and complies with the Voting Rights Act. The court's 12 December 2011 order took into account the Board's arguments that it needed to have an influence district in Southeast Alaska (House District 34), and that it needed to avoid pairing an Alaska Native Legislator (Representative Bill Thomas). In order to comply with the *Hickel* process, the Board must first redraw Southeast Alaska without any deviations based on the Voting Rights [Act], specifically without an influence district and without any deviations based on avoiding the pairing of minority incumbents.

In our order of May 10, 2012, we ordered that the Amended Proclamation Plan be adopted as an interim plan to govern the 2012 elections except for the districts in southeast Alaska. As to the southeast Alaska districts, we recognized that the Board had not followed our order of March 14, 2012 concerning the *Hickel* process and concluded that there was no Voting Rights Act justification for deviating from Alaska constitutional criteria. We therefore required the Board to reformulate the southeast districts within five days. Our May 10 order stated in relevant part:

> We first remand to the Board for reformulation of the districts in Southeast Alaska. These districts are presently House Districts 31-34 and Senate Districts P and Q in the Amended

Proclamation Plan. On remand, the Board must "design a plan focusing on compliance with the article VI, section 6 requirements of contiguity, compactness, and relative socioeconomic integration; it may consider local government boundaries and should use drainage and other geographic features wherever possible."[39] The reformulated plan should not be altered based on the Voting Rights Act (VRA) because there is no VRA justification for deviating from Alaska constitutional requirements in Southeast Alaska.[40]

The Redistricting Board dutifully complied with our order of May 10. It worked over a weekend and approved a new plan for southeast Alaska that it submitted to this court on May 15, 2012.[41]

After inviting and considering comments on the Board's new configuration of southeast Alaska, we decided to accept the Amended Proclamation Plan of April 5, 2012 with respect to southeast Alaska for the 2012 elections rather than the reformulated plan submitted on May 15. Our order explained the reasons for this decision:

> The court has accepted the Southeast districts as configured in the plan of April 5, 2012 rather than the reconfigurations submitted by the Redistricting Board to the court on May 15, 2012 because of the numerous objections to the reconfigured districts that this court has received. While the reconfigured districts may comply with the redistricting criteria of article VI, section 6 of the Alaska Constitution, there is a risk that the United States Department of Justice would decline to pre-clear them under the Voting Rights Act. Notice of the failure of the Department of Justice to pre-clear the new districts would come so late in the 2012 election cycle that a great disruption to the election process would result. In order to

---

[39] Quoting *In re 2011 Redistricting Cases*, 274 P.3d 466, 467 (Alaska 2012).

[40] Alaska Supreme Court Order (May 10, 2012).

[41] This plan is attached as Appendix F.

avoid this possibility, the court will not require the use of the May 15, 2012 reconfigured districts for the 2012 elections.[42]

We also stated:

The Board's petition for review from the superior court's order of April 20, 2012, has been submitted to this court and remains under advisement. One of the issues raised by the petition for review is whether the Redistricting Board failed to comply with the *Hickel* process as mandated by this court's order of March 14, 2012, with respect to the Southeast Alaska districts. Our order of May 10, 2012, is premised on the conclusion that the Board did not so comply. When we issue an order and opinion on the Board's petition for review, the order will contain a discussion of and directions concerning the reconfiguration of the Southeast Districts, and will seek to ensure that districts that comply with the Alaska Constitution can receive timely review by the Department of Justice for use in subsequent elections.[43]

It seems clear that District 34 in the Amended Proclamation Plan was not reasonably compact and that the Board drew its boundaries so that it would be a Native "influence" district under the Voting Rights Act. Further, the configuration of District 34 also affected the shape of District 32 and possibly District 33.[44] The Redistricting

---

**42** Alaska Supreme Court Order (May 22, 2012). Justices Winfree and Stowers dissented from the order of May 22, 2012 and would have required that the 2012 elections be conducted under the reconfigured districts that were submitted by the Board on May 15, 2012.

**43** *Id.*

**44** Whether failing to maintain an "influence" district would be retrogression under the Voting Rights Act was a disputed issue in the superior court. During an early presentation to the Board, Dr. Handley had referred to "a continuum of types of protected districts" including "effective districts," which always elected the minority-preferred candidate and "influence districts," which usually did. In its motion for summary

(continued...)

Board was mistaken in relying on the superior court's "compact enough" language from the court's order of December 12, 2011 and therefore did not comply with the *Hickel* process.

While this conclusion likely will result in three of the four districts in southeast Alaska being redrawn and this will potentially result in some of the undesirable effects that result from multiple redistricting in a single census cycle, the effects are limited to, at most, four districts. Further, the Board has already reformulated the southeast districts, so compliance by the Board need not entail much additional effort by that agency.[45]

## E. Conclusion

Today's opinion sends the redistricting process mandated as a result of the 2010 census back to ground zero. Much new litigation, by new parties as well as those

---

[44] (...continued)
judgment the City of Petersburg argued that "it was not necessary to establish an influence district in Southeast Alaska." The trial court initially found for the Board, but at trial Dr. Handley testified that the Department of Justice no longer recognized influence districts as such and that districts were either effective or they were not. She also testified that she understood that the Department of Justice believed that there are only five effective districts in Alaska. She thus suggested that the Voting Rights Act does not require maintenance of an influence district in southeast Alaska. In our order of May 10, 2012 we accepted this position. On the other hand, our order of May 22, 2012 indicates concern that the Department of Justice might not agree or at least might not do so readily. Underlying this uncertainty is the fact that it is difficult to determine just what is forbidden by section 5 of the Voting Rights Act. This increases the importance of Department of Justice approval, at least for jurisdictions wishing to avoid a test case.

[45] I am not by this comment suggesting that the Board must necessarily reformulate the southeast districts as it did in the May 15 plan. I realize that reformulation was necessarily put together on a rushed basis, without formalized methods for public input, and that there undoubtedly are other reconfigurations that would also meet our state's constitutional redistricting criteria.

already before us, will result.  All the disruptions of redistricting that are necessarily endured every ten years will be repeated in the next two.

The cause of this drastic remedy, according to the majority opinion, is the Board's use of unchallenged districts in devising a *Hickel* plan.  But the Board did not consider that its hands were tied by the unchallenged districts, and there were practical reasons why the Board would choose to build on rather than toss out the unchallenged work that it had already done.  Rather than force a return to the point of beginning, I think we should take the next logical step in this litigation and determine whether the Board's *Hickel* plan was based on the requirements of the Alaska Constitution.



Alaska Redistricting Board
Board Adopted Plan

-1127- APPENDIX A

6741



BOARD ADOPTED "HICKEL" MAP

APPENDIX B

EXHIBIT E
6 of 6

**6741**

# Amended Proclamation House Districts

## Statewide



-41-

Legend
City
Borough
Water Boundary

Prepared by
Alaska Redistricting Board

APPENDIX C

**6741**



HICKEL_TEMPLATE

EXHIBIT F
8 of 40

6741



**Amended Proclamation House Districts**

House District 34

APPENDIX E

6741



Option A

EXHIBIT D
Page 1 of 9

APPENDIX F

**6741**